UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

RITE AID CORP., RITE AID HDQTRS.
CORP., et al.,

                    Plaintiffs,

        -against-

AMERICAN EXPRESS TRAVEL
RELATED SERVICES CO., INC.,
AMERICAN EXPRESS COMPANY,

                 Defendants.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**Consolidated Case
08-CV-2315 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

       Plaintiffs bring this consolidated antitrust action challenging contracts that they entered

into with Defendants under sections one and two of the Sherman Antitrust Act. 15 U.S.C. §§ 1,

2. Defendants move for judgment on the pleadings asserting that Plaintiffs' claims are time-

barred by the Sherman Act's four-year statute of limitations. (Docket Entry #45.) Defendants'

motion is denied.

**I.      BACKGROUND**

     **A.     The Parties**

       This consolidated case comprises five individual actions, each brought by different

Plaintiffs against the same Defendants.[1] (See Consolidation Order dated Sept. 19, 2008 (Docket

Entry #24).) The individual plaintiffs (collectively "Plaintiffs") are Rite Aid Corp. and Rite Aid

HDQTRS. Corp. (collectively "Rite Aid") (No. 08-CV-2315); CVS Pharmacy ("CVS") (No. 08-

---

[1] A related consolidated class action is pending before Judge Pauley in the United States District Court for the
Southern District of New York. See Performance Labs Inc. et al. v. American Express Co., No. 06-CV-2974
(S.D.N.Y.).

CV-2316); Walgreen Co. ("Walgreen") (No. 08-CV-2317); Bi-Lo, LLC ("Bi-Lo") (No. 08-CV-2380); and H.E. Butt Grocery Company ("H.E. Butt") (No. 08-CV-2406). The Defendants are American Express Travel Related Services, Inc. and American Express Company (collectively "Amex" or "Defendants").

### B.    Plaintiffs' Common Allegations

All Plaintiffs challenge the same allegedly anticompetitive conduct. The court follows Plaintiffs' convention of exclusively citing CVS's Complaint when referring to allegations common to all Plaintiffs.[2] The court relies on the Plaintiffs' individual Complaints where they differ.

Plaintiffs are retail merchants who accept Amex payment cards from their customers in payment for goods and services. Plaintiffs accept Amex payment cards pursuant to "merchant agreements" that they executed with Amex. (Brenner Decl. Exs. 1-7 (Docket Entry # 47).) Each time a retail customer makes a purchase at one of Plaintiffs' stores using an Amex card, Plaintiffs agree to obtain electronic authorization from Amex to accept an Amex payment card for the customer transaction and, if authorization is granted, to accept the Amex payment card in satisfaction of payment for the goods, services, or both. In turn, Amex advances payment to the merchant and bills the cardholder for his or her transaction. Amex collects a percentage of each transaction as a service fee.

Amex collects this fee from Plaintiffs in two different ways, depending on its arrangement with the merchant. In its "three-party model," Amex collects its fee from Plaintiffs by withholding a "merchant discount fee" from the amount that it advances to merchants for

---

[2] Plaintiffs state that their individual Complaints are substantially similar except for differences in paragraph numbering. (See Pl. Opp. 4 n.5 (Docket Entry # 38).)

cardholder transactions.[3]  Plaintiffs' initial merchant discount fee ranged from 2.1% to 2.8%, depending on the Plaintiff.[4]  After an initial term, the merchant agreements authorized Amex to unilaterally change the discount rate upon written notice.[5]  Plaintiffs allege that Amex increased its price during the relevant period "at a significant rate that far exceeded the rate of inflation." (CVS Compl. ¶ 21.)  In all instances, Plaintiffs claim that Amex's merchant discount fee was supracompetitive.

Plaintiffs allege that through its merchant agreements Amex imposed anticompetitive rules that prohibit them from dissuading customers from using Amex's higher fee payment cards. Plaintiffs claim that these so-called "anti-steering rules" (1) prevent them from imposing an additional surcharge on retail customers who use Amex cards to compensate for Amex's higher merchant discount fee, (2) prevent them from offering discounted prices to retail customers who use other less costly payment methods, and (3) prevent them from informing retail customers that the higher cost of using an Amex card results in higher retail prices for all customers.  (Id. at ¶ 2.)  Plaintiffs claim that they have to raise the prices they charge to all retail customers, including customers not using Amex cards, to cover the cost of Amex's supracompetitive service fees.  (Id. at ¶ 4.)

According to Plaintiffs, the intended purpose and actual effect of the anti-steering rules was to "almost totally insulate Amex from price competition from other providers of payment card services to merchants."  (Id. at ¶ 26.)  Plaintiffs allege that Amex exploited its monopoly

---

[3] Amex also uses a four-party model in which it licenses banks to issue Amex trademarked cards to cardholders. Amex pays merchants the amount of the transaction less its merchant discount fee.  The bank then pays Amex the amount of the transaction but retains an "issuer rate discount" as its service fee for the transaction.

[4] Bi-Lo: 2.1%, (Brenner Decl., Ex. 1 at 8); H.E. Butt: 2.1% (id. Ex. 2 at 8); CVS: 2.5-2.6% (id. Ex. 3 at 6); Rite Aid: 2.35-2.8%, 2.1-2.6% (id. Ex. 4 at 1, 12); Walgreen: not provided.

[5] (See Brenner Decl. Ex. 1 at 4 (Bi-Lo) ("Effective every April 1st . . . we may adjust the Discount Rate."); id. Ex. 3 at 3 (CVS) ("After the Initial Term, we shall have the right to adjust the Discount rate at any time upon thirty (30) days written notice to you."); id. Ex. 4 at 8 (Rite Aid) (upon thirty days written notice).)

power by creating and perpetuating the anti-steering rules to charge merchants supracompetitive monopoly prices for its payment card services.  (<u>Id.</u> at ¶ 5.)  Plaintiffs allege that Amex "devoted significant resources to the aggressive enforcement" of the anti-steering rules and canceled agreements with merchants who violated them.  (<u>Id.</u> at ¶ 25.)  Plaintiffs do not allege any specific acts of enforcement against themselves.  Nor do Plaintiffs allege any specific facts about the resources that Amex devoted to its enforcement activities.  Plaintiffs further allege that "each individual merchant could, of course, have simply refused to accept Amex cards.  As a practical matter, however, such a decision was not economically feasible or realistic."  (<u>Id.</u> at ¶ 28.)  The merchant agreements indicate that Plaintiffs could have terminated the agreements after their initial terms and upon written notice to Amex.[6]  According to Plaintiffs, "[t]he profits lost as a result would have been greater than the anti-competitive overcharge suffered at the hands of Amex."  (<u>Id.</u>)

Plaintiffs claim that Amex "monopolized or attempted to monopolize the market for the sale of American Express payment services to merchants within the meaning of section [two] of the Sherman Act and imposed on merchants anticompetitive contract terms that unreasonably restrained competition within the meaning of section [one] of the Sherman Act."  (<u>Id.</u> at ¶ 5.)  As a result, Plaintiffs allege that Amex injured their businesses by (1) compelling them to adhere to the anti-steering rules and (2) charging supracompetitive prices.

### C.     Plaintiff-specific Allegations

Although Plaintiffs' Opposition brief states that all five Complaints are substantially similar, the individual Complaints differ in several important ways.  Three of the five individual

---

[6] (<u>See</u> Brenner Decl. Ex. 1 at 6 (Bi-Lo: "After the Initial Term, this Agreement will remain in effect until terminated by either party upon written notice . . . termination will be effective thirty (30) days after receipt of such notice"); <u>id.</u> Ex. 2 at 7 (H.E. Butt: sixty days notice); <u>id.</u> Ex. 3 at 5 (CVS: thirty days written notice); <u>id.</u> Ex. 4 at 2, 11 (Rite Aid: thirty days written notice); <u>id.</u> Ex. 5 at 4 (Walgreen: termination is effective 3 days after it is sent).)

plaintiffs assert claims for injunctive relief in addition to claims for damages and some plaintiffs also seek declaratory relief. Some individual plaintiffs only challenge merchant agreements that are no longer in effect, and others challenge agreements that remain in effect. Because the court finds these differences significant, it identifies each plaintiff's requested relief.

       i.    <u>Rite Aid</u>

Rite Aid challenges its merchant agreement dated December 30, 1996 and effective, as amended, through June 30, 2005. (Rite Aid Compl. ¶¶ 1, 7.) Since July 1, 2005, Rite Aid has accepted Amex cards under a new agreement, which Rite Aid does not challenge in this action. (<u>Id.</u> ¶ 7.) Rite Aid only seeks money damages for injuries suffered through June 30, 2005. (<u>Id.</u> at 16.)

       ii.    <u>CVS</u>

CVS challenges its merchant agreement dated December 1, 1996 and effective, as amended, through June 30, 2006. (CVS Compl. ¶ 1.) Since July 1, 2006 CVS has accepted Amex cards under a new agreement, which CVS does not challenge in this action. (<u>Id.</u> at ¶ 7.) CVS seeks money damages and declaratory relief. It only seeks money damages for injuries suffered through June 30, 2006. (<u>Id.</u>) CVS also seeks a declaration that Amex's anti-steering violated the antitrust laws. (<u>Id.</u> at 17.)

       iii.    <u>Walgreen</u>

Walgreen challenges its merchant agreement dated November 29, 1993. (Walgreen Compl. ¶ 6.) Walgreen seeks money damages, injunctive relief, and declaratory relief. Walgreen does not limit the time period from which it claims damages. Walgreen seeks to enjoin Amex from "requiring Plaintiff and other merchants to agree to or enforcing the anti-steering rules against Plaintiff and any other merchant and directing that all such existing

contract obligations be rescinded." (Id. at 16.) Walgreen also seeks a declaration that Amex's anti-steering rules violated the antitrust laws. (Id.)

       iv.    <u>Bi-Lo</u>

Bi-Lo challenges its merchant agreement dated August 11, 1999, and amended on the same day, August 11, 1999.[7] (Bi-Lo Compl. ¶ 1.) Bi-Lo asserts claims for money damages, injunctive relief, and declaratory relief. (Id. at 17.) Bi-Lo does not limit the time period from which it claims damages. Bi-Lo seeks to enjoin Amex from enforcing the anti-steering rules and rescinding them from its merchant agreement. (Id.) Bi-Lo also seeks a declaration that Amex's anti-steering rules violate the antitrust laws. (Id.)

       v.    <u>H.E. Butt</u>

H.E. Butt challenges its merchant agreement dated November 1, 1999. (H.E. Butt Compl. ¶ 6.) H.E. Butt seeks money damages, injunctive relief, and declaratory relief. (Id. at 16.) It does not limit the time period from which it claims damages. H.E. Butt also seeks to enjoin Amex from "requiring Plaintiff and other merchants to agree to or enforcing the anti-steering rules against Plaintiff and any other merchant and directing that all such existing contract obligations be rescinded." (Id.) H.E. Butt also seeks a declaration that Amex's anti-steering rules violate the antitrust laws. (Id.)

## II.    DISCUSSION

### A.    Standard of Review

A statute of limitations defense is an affirmative defense that a defendant must plead and prove. Fed. R. Civ. P. 8(c)(1). A defendant may, however, raise an affirmative defense in a Rule 12(b)(6) (failure to state a claim) motion, "if the defense appears on the face of the complaint."

---

[7] Amex submits a second merchant agreement that Bi-Lo dated 2003. (See Brenner Decl. Ex. 7.) It is unclear whether Bi-Lo is challenging this agreement in this action.

See Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406, 425-26 (2d Cir. 2008). Because a failure-to-state-a-claim defense can be brought on a motion for judgment on the pleadings, it follows that a defendant may properly bring a statute-of-limitations defense on a motion for judgment on the pleadings. See Higgins v. New York Stock Exch., Inc., 942 F.2d 829, 831(2d Cir. 1991) (affirming statute of limitations dismissal of plaintiff's antitrust action on a motion for judgment on the pleadings).

The standard of review on a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same standard applied under a Rule 12(b)(6) motion. Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994). In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted). To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, — U.S. —, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" on a motion to dismiss. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).

### B. Legal Standard

Under the Sherman Act's statute of limitations, damages are recoverable if a plaintiff files suit within four years after a cause of action accrues. 15 U.S.C. § 15b. An antitrust cause of action generally "accrues and the statute begins to run when a defendant commits an act that

injures a plaintiff's business." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971). A plaintiff who timely files suit is entitled to recover damages suffered as of the date he or she files and all provable damages that flow from the defendant's harmful act and which the plaintiff will predictably suffer in the future. Id. at 338-339.

Plaintiffs' section one and section two injuries arise from Amex (1) compelling Plaintiffs to adhere to the anti-steering rules and (2) charging Plaintiffs supracompetitive discount fees. Amex moves to dismiss Plaintiffs' claims solely on timeliness grounds. The court, therefore, assumes for the purposes of this Memorandum & Order that Plaintiffs otherwise state valid causes of action under the antitrust laws. See 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320a at 283 (3d ed. 2007) ("[T]he best way to analyze the limitation issue is to assume that the antitrust laws have been violated and then consider when the antitrust cause of action has accrued and whether other factors may . . . delay the running of the statute."); see also Nat'l Souvenir Center, Inc. v. Historic Figures, Inc., 728 F.2d 503, 509 (D.C. Cir. 1984). Because different accrual rules apply depending on whether Plaintiffs' claims arise under Sherman Act sections one or two, the court addresses each below.

      1.    Section Two Claims

A plaintiff must establish two elements to state a claim under section two: the defendant's (1) "possession of monopoly power in the relevant market" and (2) "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see 15 U.S.C. § 2. Plaintiffs allege that Amex possessed and used its monopoly power to impose the anti-steering rules on them and that those rules allowed Amex to

continue to overcharge them for retail transactions.  Plaintiffs seek, <u>inter alia</u>, damages for those overcharges.

The date on which a section two monopolization claim accrues depends on the relationship that the plaintiff has with the defendant as either a competitor or as a purchaser of the defendant's products and services.  <u>See</u> <u>Berkey Photo v. Eastman Kodak Co.</u>, 603 F.2d 263, 295-96 (2d Cir. 1979).  A purchaser plaintiff's cause of action accrues when he or she actually pays an overcharge.  <u>Id.</u>  By contrast, a competitor plaintiff's cause of action accrues at the time of the defendant's anticompetitive conduct.  <u>Id.</u>

The purchaser-competitor distinction is based on differences in when a monopolization scheme injures each plaintiff.  <u>See</u> <u>Zenith</u>, 401 U.S. at 338 (cause of action generally "accrues  . . . when a defendant commits an act that injures a plaintiff's business").  Because competitors "may be injured at the time the anticompetitive conduct occurs," their cause of action accrues when the monopolist acts anticompetitively.  <u>Berkey</u>, 603 F.2d at 295.  By contrast, a purchaser's damages are "entirely speculative" at that time.  According to the Second Circuit, a purchaser plaintiff is not harmed until "the monopolist actually sets an inflated price and its customers determine the amount of their purchases."  <u>Id.</u>  "[A] purchaser suing a monopolist for overcharges paid within the previous four years may [therefore] satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period."[8]  <u>Id.</u> at 296; <u>see</u> <u>Meijer v. 3M</u>, No. 04-CV-5871, 2005 WL 1660188, at *4 (E.D. Pa. July 13, 2005) ("the requisite injurious act within the limitations period can include being overcharged as the result of an unlawful act which took place outside the limitations period but continues to allow the defendant to maintain market control"); <u>In re Buspirone Patent Litig.</u>, 185 F. Supp. 2d 365, 378

_____

[8] The Court of Appeals rejected the district court's ruling that a purchaser's cause of action "accrues when the defendant engages in the anticompetitive conduct that is a prerequisite for suit."  <u>Berkey</u>, 603 F.2d at 296.

(S.D.N.Y. 2002) ("if a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings").

Plaintiffs are retail merchants who purchase Amex's payment services. They do not offer payment services and are not in competition with Amex. Under <u>Berkey</u>'s purchaser rule, Plaintiffs' section two overcharge claims accrued when they paid Amex a supracompetitive merchant discount fee. The statute of limitations in this context only bars Plaintiffs' claims based on overcharges outside of the limitations period—i.e. overcharges paid more than four years before filing suit.

### 2. Section One Claims

Whereas section two of the Sherman Act prohibits monopolization schemes, section one prohibits contracts, combinations, and conspiracies, in restraint of trade. 15 U.S.C. § 1. To establish a claim under section one, a plaintiff must prove (1) that two or more defendants entered into a contract, combination, or conspiracy, and (2) that the conspiracy was in restraint of trade in interstate commerce. <u>Belfiore v. New York Times Co.</u>, 826 F.2d 177, 181 (2d Cir.1987), <u>cert.</u> <u>denied</u>, 484 U.S. 1067 (1988). Section one does not reach conduct that is wholly unilateral. <u>See</u> <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 767 (1984) ("The conduct of a single firm is governed by section [two] alone").

Plaintiffs allege that Amex enforced and charged supracompetitive merchant discount fees pursuant to illegal contract provisions. Although it is not clear from Plaintiffs' pleadings which antitrust theory (tying, price maintenance, price fixing, refusal to deal, etc.) they are pursuing, Plaintiffs allege that Amex's anti-steering rules are unreasonable restraints of trade in violation section one. Plaintiffs do not claim that Amex's merchant agreements are instruments

of a conspiracy involving another defendant.[9]  At this stage of the litigation, however, the court assumes that Plaintiffs otherwise state a valid cause of action and only addresses whether Plaintiffs' claims are timely.

Under <u>Zenith</u>'s general accrual rule, any section one cause of action arising out Amex's merchant agreements accrued on the date that Plaintiffs' merchant agreements took effect.  <u>See</u> 401 U.S. at 338.  According to Plaintiffs, this is when Amex first compelled Plaintiffs to adhere to the anti-steering rules and injured Plaintiffs' by restricting their ability to steer consumers from using Amex payment cards.  Because Amex committed an anticompetitive act that injured Plaintiffs' business when the merchant agreements took effect the statute of limitations began to run at that time.  Plaintiffs filed this lawsuit more than four-years after their merchant agreements became effective.  Plaintiffs' section one claims are, therefore, time-barred unless an exception to the statute of limitations applies.  Plaintiffs argue that two exceptions apply: (1) the speculative damages exception and (2) the continuing violation exception.

a.    <u>Speculative Damages Exception</u>

Under the Sherman Act, a plaintiff is entitled to recover damages suffered as of the date the cause of action accrued and all future damages flowing from the defendant's illegal conduct.  <u>Zenith</u>, 401 U.S. at 338-339.  But future damages are unrecoverable at the time that an antitrust claim accrues, "if the fact of their accrual is speculative <u>or</u> their amount and nature unprovable."  <u>Id.</u> at 339 (emphasis supplied).  "[T]he cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted."  <u>Id.</u> at 339-40.

---

[9] Plaintiffs bring this action against two separate legal entities: American Express Company and, its wholly-owned subsidiary, American Express Travel Related Services, Inc.  But a parent corporation cannot conspire with its wholly-owned subsidiary.  <u>Copperweld</u>, 467 U.S. at 771.

There is a split of authority on how uncertain damages must be to qualify for this exception. Some courts hold that <u>Zenith</u>'s speculative damages exception only applies if the fact of future damage is speculative and not if the nature and amount of future damages is uncertain.[10] The Second Circuit, however, has consistently stated that the second part of <u>Zenith</u>'s speculative damages definition means what it says: damages are also unrecoverable if their amount and nature are unprovable. <u>See</u> <u>Higgins</u>, 942 F.2d at 832 ("damages caused by an antitrust injury are so speculative that the court is unwilling to estimate them."); <u>Bankers Trust Co. v. Rhoades</u>, 859 F.2d 1096, 1107 (2d Cir. 1988) (damages are "'unrecoverable,' at least at this time, because 'their accrual is speculative' and 'their amount and nature unprovable'"); <u>Ansul Co. v. Uniroyal, Inc.</u>, 448 F.2d 872, 885 (2d Cir. 1971); <u>see also</u> <u>Berkey</u>, 603 F.2d at 295-296. This does not mean that any damages calculation short of mathematical precision is automatically speculative. <u>Zenith</u>'s speculative damages exception applies in this circuit if the fact of damage is uncertain or if the nature and amount of damages cannot be reasonably estimated. <u>See</u> <u>Ansul</u>, 448 F.2d at 885.

Under this circuit's law, the court concludes that Plaintiffs have alleged sufficient facts to plausibly conclude at this stage of the litigation that damages caused by Amex's overcharges were speculative when they executed Amex's merchant agreements—i.e. when their section one causes of action accrued. At that time, the amount of Plaintiffs' damages arising from Amex's supracompetitive discount fees could not have been reasonably estimated. The merchant

---

[10]     [U]ncertain damages, which prevent recovery, are distinguishable from uncertain extent of damage, which does not prevent recovery. The former denotes failure to establish an injury, while the latter denotes imprecision with regard to the scope or extent of the injury. The question of whether there is a right to recovery is not to be confused with the difficulty in ascertaining the scope or extent of the injury.

<u>Pace Indus., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 240 (9th Cir. 1987) (internal citations omitted); <u>see also</u> <u>Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.</u>, 546 F.2d 570, 573 (4th Cir. 1976); <u>Camotex, S.R.L. v. Hunt</u>, 741 F. Supp. 1086, 1090 (S.D.N.Y. 1990).

agreements did not specify the payment schedule or the quantity of Plaintiffs' purchases of Amex payment services: when, how large, and how many Amex retail transactions Plaintiffs would process. Even if these terms could have been estimated when Plaintiffs executed the merchant agreements, Amex retained the ability to unilaterally change the discount fee after the agreements' initial terms. And Plaintiffs allege that Amex increased this fee during the relevant period "at a significant rate that far exceeded the rate of inflation." For these reasons, the court cannot dismiss Plaintiffs' claims for damages flowing from the merchant agreements that they suffered within the limitations period.[11]

Following discovery, Amex may introduce evidence showing that future damages flowing from Plaintiffs' merchant agreements could have been reasonably estimated when they became effective. If future damages were not speculative when the agreements became effective, the cause of action to collect them would also have accrued at that time. If damages were not speculative, Plaintiffs' section two claims may also be time-barred. As discussed above, Berkey's purchaser accrual rule is based on the rationale that a purchaser's damages for paying overcharges are "entirely speculative" until the purchaser actually pays the overcharge. If damages from Amex's overcharges could have been reasonably estimated based on the terms contained in the merchant agreements, the justification for the purchaser accrual rule may not apply.

b.      Continuing Violation Exception

When an antitrust injury is caused a single injurious act, the statute of limitations runs from that act, even if the resulting injury continues over a prolonged period. See Zenith, 401

---

[11] The court notes that Plaintiffs' claims would be time-barred if the speculative damages exception were limited to apply only when the fact of damage is speculative. The fact that Amex's merchant agreements would inflict antitrust harm, if at all, is equally clear today as it was when Plaintiffs first executed the agreements and when they paid Amex's discount fee. The obligations of both parties were clearly set forth in the agreement's anti-steering rules and other provisions. Those obligations have not changed. Only the merchant discount fee changed. But any change in the discount fee affects the amount of damages, not the fact of damage.

U.S. 338-339; 8 Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulation §

162.02[2] (2d ed. 2006).  A plaintiff injured by a single act can only recover damages suffered

after the date of accrual by filing suit within four years of the injurious act.  Id.  If, however, an

antitrust violation consists of a series of acts that repeatedly invade a plaintiff's interests and

continue over time, a cause of action may accrue each time the plaintiff is injured anew.  See

Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004); Pace Indus., Inc. v. Three

Phoenix Co., 813 F.2d 234, 237 (9th Cir. 1987); see 8 Kalinowski § 162.02[2].  The statute of

limitations does not only run from a defendant's initial act if the defendant engages in "conduct

which constitute[s] a continuing violation of the Sherman Act and which inflict[s] continuing

and accumulating harm."  Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.

15.

 Although the continuing violation exception most often applies to conspiratorial conduct,

a "cause of action may also reaccrue, in the absence of a conspiracy to violate the antitrust laws,

when the defendant commits an act which by its nature is a continuing antitrust violation."

Airweld, Inc. v. Airco, Inc., 742 F.2d 1184 (9th Cir. 1984).  Long-term contractual duties that

obligate anticompetitive conduct can form the basis of a continuing antitrust violation.  This

much follows from the Supreme Court's holding in Hanover Shoe that a single defendant's

ongoing policy of leasing and refusing to sell its shoe machinery to the plaintiff shoe

manufacturer constituted a continuing violation.  392 U.S. at 501 n. 15.  The conclusion in

Hanover Shoe that an anticompetitive policy inflicts continuing and accumulating harm applies

equally to an ongoing policy memorialized into a contractual duty.  In both cases a plaintiff's

interests are repeatedly invaded by an ongoing policy.

When the continuing violation exception applies, "[a]n overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." Pace Indus., 813 F.2d at 237. In cases challenging illegal contracts made effective before the limitations period and that remain effective during the limitations period, the continuing-violation question is whether acts within the limitations period toll the cause of action challenging the underlying contract. Finding an overt act, however, depends on the facts of the case, the alleged antitrust violation, and the jurisdiction in which the suit is filed.

An overt act "is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." DXS, Inc. v. Siemens Med. Sys, Inc., 100 F.3d 462, 467 (6th Cir. 1996) (internal quotation marks omitted); see In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 228-230 (E.D.N.Y. 2003). "[E]ach overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) (internal quotation marks omitted). A plaintiff cannot, however, "use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." Id. at 190. The continuing violation exception only allows a plaintiff to recover damages caused by overt acts committed inside the limitations period. Id. at 189.

Because Plaintiffs do not assert which antitrust theory they are pursuing, the court looks to antitrust cases challenging contracts that create illegal tying arrangements to guide its analysis. These cases generally address vertical agreements that are themselves violations of section one and are not necessarily violations because they are instruments of an unlawful conspiracy. At

this stage of the litigation, it appears that Plaintiffs are challenging their own vertical agreements with Amex. Plaintiffs also do not allege that Amex's merchant agreements are instruments of an unlawful conspiracy or that a broader conspiracy exists.[12]

In the context of contracts imposing illegal tying arrangements, courts are split on whether contractual performance can constitute an overt act under the continuing violation exception. One court holds that "the 'overt act' requirement may be satisfied merely by the parties continuing to maintain contractual relationships that directly affect competition in the tied product market." Nat'l Souvenir, 728 F.2d at 510. Another court holds that performance of an anti-competitive tying contract is not sufficient to restart the limitations period. See Varner, 371 F.3d at 1020.

By contrast, in Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1051-52 (5th Cir. 1982), the Fifth Circuit held that an action challenging a contract containing an illegal tie accrued when the contract was executed and that payments received pursuant to that contract did not restart the limitations period. Because the rights and liabilities of the parties to the contract were fixed when they executed it, the court found that the contract payments were "the abatable but unabated inertial consequences of some pre-limitations action, rather than from some injurious act actually occurring during the limitations period." Id. at 1053 (internal quotation marks omitted). The Fifth Circuit, however, distinguished a case in which the contract's terms—i.e. price, quantity, and delivery schedule—were not fixed and antitrust damages were speculative when the contract was executed. The Court of Appeals stated that collecting contract payments in these circumstances could constitute overt acts in furtherance of a continuing violation under the "continuing benefits exception." Id. 1052-53.

---

[12] Should Plaintiffs' amend their pleadings, different limitations rules may apply. See, e.g. Klehr, 521 U.S. at 189 (noting that in a "price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years . . . each sale to the plaintiff, starts the statutory period running again . . . " (internal quotation marks omitted)).

The Court of Appeals further explained that even if a contract's terms are initially fixed, damages may still be speculative if a defendant can unilaterally and arbitrarily change the contract's terms in a way that affects antitrust damages.  Id. at 1054.  But a defendant's ability to unilaterally change contract terms that do not affect antitrust damages is irrelevant to analyzing speculative antitrust damages.  Id.

The statute of limitations question in this case depends on whether Amex committed an overt act as part of its contractual policy during the limitations period.  In the absence of binding authority in this circuit, the court applies the Fifth Circuit's reasoning in Kaiser to the following threshold rule.  In the context of a plaintiff's challenge to its own contract, contractual performance is not categorically barred from satisfying the overt act requirement of a continuing violation.  See generally Andrea Theatres, Inc. v. Theatre Confections, Inc., 787 F.2d 59, 65 (2d Cir. 1986) (noting that an antitrust "claim need not be based solely upon the execution of a contract, but may also seek relief for subsequent injuries incurred within the four-year period, even though the harm stemmed from performance of the contract").  Performance during the limitations period pursuant to an illegal prelimitations contract can constitute an overt act if resulting damages were speculative, within the meaning of Zenith, when the plaintiff executed the challenged contract.  If damages were speculative at execution, contractual performance during the limitations period may constitute an overt act if the alleged performance also satisfies the two-fold test for finding an overt act.[13]  See DXS Inc., 100 F.3d at 467.  If damages were not speculative at the time the contract was executed, acts contemplated by the contract and performed during the limitations period cannot constitute overt acts in furtherance of a

---

[13] In Kaiser, the Fifth Circuit stated that under the continuing benefit version of the continuing violation exception, collecting contractual payment is an overt act if antitrust damages were speculative when the underlying cause of action accrued.  677 F.2d 1051-52.  The Second Circuit has not recognized this exception.  This court declines to categorically hold that contract-payment collections constitute overt acts when damages are speculative.  In light of the weight of authority stating that contract payments do not constitute overt acts, see infra note 15, the court applies the two-fold overt act test to determine whether a particular contract payment constitutes an overt act.

continuing-violation challenge to the contract.  In these circumstances, executing the contract is the last overt act.  Any resulting performance would merely be a reaffirmation of that agreement.

Requiring that damages arising from a plaintiff's contract be speculative before contractual performance can qualify as an overt act is not inconsistent with the authorities concluding that contractual performance does not constitute overt acts.  The Eighth Circuit reasoned in <u>Varner</u> that "when a complaining party [is] <u>fully aware</u> of the terms of an agreement when it entered into the agreement, an injury occurs only when the agreement is initially imposed; thus, the limitations period typically is not tolled by the requirements placed on the parties under the agreement."  371 F.3d at 1020 (emphasis supplied).  According to Areeda, "[t]he best solution to the problem of long-term contracts that are unlawful, if at all, from the beginning but also <u>known to the plaintiff</u>, is to use the statute of limitation to bar the tardy damage action but to give flexibility in equity to permit the injunction against continued enforcement."  Areeda ¶ 320c3 at 292 (emphasis supplied).  Applying <u>Zenith</u>'s standard for speculative damages to this threshold issue—of whether contractual performance can constitute an overt act—provides a well-developed legal standard to determine whether a plaintiff was sufficiently aware of antitrust damages arising from contractual performance when it executed the contract.

Under these standards, the court finds that Amex's ongoing policy memorialized in its anti-steering rules constitutes a continuing antitrust violation.  <u>See</u> <u>Hanover Shoe</u>, 392 U.S. at 501 n. 15.  According to Plaintiffs, their interests were invaded by their ongoing contractual obligations to adhere to an unreasonable restraint of trade and to pay a supracompetitive merchant discount fee.  The court already concluded that Plaintiffs' antitrust damages arising from the merchant agreements were speculative at the time they executed them.  <u>See</u> <u>supra</u>

section II(B)(2)(a).  Whether Plaintiffs' section one claims are time-barred therefore depends on whether Plaintiffs allege that Amex committed an overt during the limitations period.  Plaintiffs' Complaints present two possibilities: (1) collecting a discount fee each time a consumer made a purchase with an Amex payment card and (2) unilaterally increasing the discount fee.[14]

Collecting individual discount fee payments under the terms of the merchant agreements cannot constitute overt acts.  The collections fail the first prong of the two-fold test for finding an overt act.  Collecting a contract fee is not a new and independent act.[15]  Plaintiffs obligated themselves to pay the discount fee at the time that their merchant agreements became effective.  The obligation to pay merely manifested itself into the duty to pay a particular discount fee each time a consumer used an Amex payment card.  It is immaterial that Plaintiffs' duty to pay a particular discount fee only arose when a consumer transaction was processed; consumer transactions only triggered a predetermined contractual duty.  Because each overcharge depended on a predetermined duty memorialized in the merchant agreements, each discount fee payment or charge is merely a reaffirmation of Plaintiffs' prelimitations agreement.

But Amex's unilateral increases to its merchant discount fee do constitute overt acts.  The fee increases satisfy both parts of the overt-act test.  First, the increases were new and

---

[14] Plaintiffs also allege generally that Amex aggressively enforced its merchant agreements.  "Active enforcement of an illegal contract may, under certain circumstances, cause renewal of an injury and restart the statute of limitations" under the continuing violation exception.  Aurora Enters., Inc. v. Nat'l Broad. Co., 688 F.2d 689, 694 (9th Cir. 1982); see Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 512 F.2d 1264, 1269-70 (9th Cir. 1975).  Because Plaintiffs do not allege any actual acts of enforcement towards them, the court cannot address whether Amex's enforcement actions constitute overt acts.

[15] Courts routinely state that contract payments cannot constitute overt acts.  See Grand Rapids Plastics, Inc. v. Lakian, 188 F.3d 401, 406 (6th Cir. 1999) ("even if the payment agreement constituted a continuing violation . . .the individual payments . . . were only a manifestation of the previous agreement.  The individual payments therefore do not constitute a 'new and independent act . . .'"); Eichman v. Fotomat Corp., 880 F.2d 149 (9th Cir. 1989) ("passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations"); Aurora Enters., Inc. v. Nat'l Broad. Co., 688 F.2d 689, 694 (9th Cir. 1982) ("that defendants receive a benefit today as a result of a contract executed" before the limitations period "is not enough to restart the statute of limitations"); In re Ciprofloxacin, 261 F. Supp. 2d at 229 (holding that payments contemplated by the fixed terms of challenged agreements are not sufficient to restart the limitations period); In re Buspirone, 185 F. Supp. 2d at 379 (payments that are "mere consequences of the original Agreement . . . do not restart the statute of limitations").

independent acts.  Amex's fee increases did not merely reaffirm a contractual duty memorialized in a prelimitations agreement.  Amex had no contractual obligation to change the discount fee.  The increases were not triggered by an event memorialized in the merchant agreements.  Upon written notice, Amex could, and allegedly did, raise the discount fee unilaterally.  The merchant agreements only contemplated that Amex <u>could</u> unilaterally increase the discount fee, they did not predetermine that Amex <u>would</u> increase the discount fee.  Moreover, after the agreements' initial terms, Plaintiffs could have unilaterally terminated the merchant agreements upon written notice to Amex.  And some Plaintiffs could have terminated their agreements (upon thirty days notice) before a fee increase could take effect (upon thirty days notice).  The second prong of the overt act test is also satisfied.  Each fee increase inflicted new and accumulating harm.  Any fee increase inflicted a greater quantum of damages to an accumulating harm.

This result is consistent with a similar case brought against American Express in the Southern District of New York.  In <u>Marcus Corp. v. American Express Co.</u>, No. 04-CV-5432, 2005 WL 1560484 (S.D.N.Y. July 5, 2005), a merchant retailer challenged American Express's "honor all cards" ("HAC") policy as an illegal tying arrangement under section one.  The plaintiff claimed that American Express's contractual policy imposed an illegal tie requiring it to accept not only American Express charge cards issued by American Express but also credit cards issued by entities licensed to use the American Express logo.  The plaintiff, like the Plaintiffs in this case, executed the agreement containing the challenged policy before the limitations period.  The plaintiff claimed damages based on American Express's supracompetitive merchant discount fee.  During the limitations period Amex contracted with two banks to issue American Express credit cards, which the plaintiff then had to accept under the HAC policy.  Judge Daniels applied <u>Berkey</u>'s accrual rule for monopolization claims to hold that the plaintiff's section one

claims seeking damages for overcharges suffered from accepting the bank-issued credit cards accrued when American Express contracted with the issuing banks and compelled the plaintiff to accept those cards under the HAC policy, not when the plaintiff executed the merchant agreement containing the challenged tie.[16]  Judge Daniels's decision also did not rest on finding a continuing violation reaccruing each time a consumer used a bank-issued American Express card during the limitations period.  See id. at *2 n.10.

Because the court finds that Amex's discount fee adjustments are overt acts, it follows that a new cause of action accrued to Plaintiffs each time Amex adjusted its discount fee within four years before Plaintiffs filed suit.[17]  Under the continuing violation exception, Plaintiffs' section one claims are not barred to the extent that they seek damages based on fee adjustments that Amex implemented within four years before Plaintiffs filed suit.

### 3.  Equitable Relief

By its terms, the Clayton Act's four-year statute of limitations, 15 U.S.C. § 15b, does not apply to claims for equitable relief under section 16 of the Clayton Act, 15 U.S.C. § 26.  Instead a four-year period of laches applies.  See Argus Inc. v. Eastman Kodak Co., 552 F. Supp. 589 (S.D.N.Y. 1982) (discussing Int'l Tele. & Tele. Co. v. Gen. Tele. & Elecs. Corp., 518 F.2d 913, 927-29 (9th Cir. 1975).  After the four-year laches period expires, a court may, in its discretion, allow an action for equitable relief to go forward if it determines "(1) that sufficient reasons

---

[16] This court does not apply Berkey's accrual rule for monopolization claims to Plaintiffs section one claims.  In this case Plaintiffs' section one causes of action accrued when they executed their merchant agreements—when Plaintiffs' allege they first suffered an antitrust injury.  (See CVS Compl. ¶ 53) ("As a direct and proximate result of Amex's imposition and enforcement of the anti-steering rules, CVS was injured in its business by . . . being compelled to adhere to the anti-steering rules.")

[17] CVS alleges that Amex increased its discount fee during the relevant period.  In their brief, Plaintiffs represent that the allegations contained in CVS's Complaint are substantially similar to the allegations in all the individual-plaintiff Complaints except for differences in paragraph numbering.  The court's holding that a new cause of action accrued each time Amex unilaterally adjusted its fee during the limitations period only applies to an individual plaintiff to the extent that Amex adjusted its discount fee for that individual plaintiff during the limitations period.

cognizable in equity excuse the delay or (2) that the delay caused defendants no prejudice." <u>Id.</u> In its answers, Amex pleads the doctrine of laches as affirmative defenses to Plaintiffs' claims. (<u>See</u> Answer to Rite Aid Compl. ¶ 54; Answer to CVS Compl. ¶ 55; Answer to Walgreen Compl. ¶ 57; Answer to Bi-Lo Compl. ¶ 56; Answer to H.E. Butt Compl. ¶ 57.) Neither Plaintiffs nor Amex address the applicability of laches in their moving papers. The court declines to <u>sua</u> <u>sponte</u> address the issue.

## III.  CONCLUSION

For the forgoing reasons Defendants' motion for judgment on the pleadings is denied.


SO ORDERED.

<u>/s/ Nicholas G. Garaufis</u>
NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
     March 3, 2010