UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

IN RE: AMERICAN EXPRESS ANTI-
STEERING RULES ANTITRUST LITIGATION

--------------------------------------------------------------------

This Document Relates to:

All Individual Merchant Plaintiff Actions

08-CV-2315 (NGG) (RER)
08-CV-2316 (NGG) (RER)
08-CV-2317 (NGG) (RER)
08-CV-2380 (NGG) (RER)
08-CV-2406 (NGG) (RER)
11-CV-0337 (NGG) (RER)
11-CV-0338 (NGG) (RER)
------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-MD-2221 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

In this set of consolidated antitrust actions (the "MP Actions"), Merchant Plaintiffs (the

"MPs")[1] challenge under Sections 1 and 2 of the Sherman Antitrust Act the contracts that they

have entered into with Defendants American Express Travel Related Services Company, Inc. and

American Express Company (together, "Amex" or "Defendants"). Specifically, the MPs

challenge Defendants' anti-steering rules, referred to as the Non-Discrimination Provisions

("NDPs"), which are contained in merchant agreements entered into between Amex and each

MP. The MPs seek an order enjoining Amex from enforcing the NDPs, as well as treble

damages for the injuries the MPs allege they have sustained on account of the NDPs.

Pending before the court are the parties' cross-motions for summary judgment, as well as

the MPs' motions for leave to modify the Scheduling Order and amend the operative pleadings,

---

[1] The MPs are Ahold U.S.A., Inc.; Albertson's LLC; BI-LO, LLC; CVS Pharmacy, Inc.; The Great Atlantic & Pacific Tea Company, Inc.; H.E. Butt Grocery Co.; Hy-Vee, Inc.; The Kroger Co.; Meijer, Inc.; Publix Super Markets, Inc.; Raley's Inc.; Rite Aid Corporation; Rite Aid HDQTRS Corp.; Safeway Inc.; SuperValu Inc.; and Walgreen Co.

and motion for the application of collateral estoppel. For the reasons discussed below, the MPs'

motion to modify the Scheduling Order and for leave to amend is DENIED WITHOUT

PREJUDICE, the MPs' motion for the application of collateral estoppel is DENIED WITHOUT

PREJUDICE, and the MPs' motion for partial summary judgment is DENIED WITHOUT

PREJUDICE. The court DENIES Amex's motion for summary judgment with respect to the

no-surcharge rule and Amex's statute of limitations and laches defenses, and RESERVES

JUDGMENT on Amex's motion for summary judgment with respect to the existence of an

Amex-only market.

## I.     BACKGROUND AND RELEVANT PROCEDURAL HISTORY

The MP Actions comprise part of a multi-district litigation ("MDL") pending before the

court, and the court addresses the parties' motions with the benefit of having presided over the

coordinated litigation for several years,[2] as well as the seven-week bench trial in the related case

captioned United States, et al. v. American Express Co., et al., No. 10-CV-4496 (E.D.N.Y.)

(NGG) (RER), appeal docketed, No. 15-1672-CV (2d Cir.) (the "Government Action"). See Rite

Aid Corp. v. Am. Express Travel Related Servs. Co., 708 F. Supp. 2d 257 (E.D.N.Y. 2010)

(the "SOL Decision") (denying Defendants' motion for judgment on the pleadings in the MP

Actions); United States v. Am. Express Co., 88 F. Supp. 3d 143 (E.D.N.Y. 2015) (the

"Government Decision") (findings of fact and conclusions of law in the Government Action);

United States v. Am. Express Co., No. 10-CV-4496 (NGG) (RER), 2015 WL 1966362

(E.D.N.Y. Apr. 30, 2015) (setting forth reasoning behind terms of Permanent Injunction in the

Government Action).

---

[2] Although they comprise part of the MDL, the MP Actions were originally filed in this court and therefore will also proceed to trial in this jurisdiction.

In order to describe and address the parties' pending motions, the court first must provide a brief outline of the procedural history of the MP Actions. In 2008, certain of the MPs filed antitrust actions against Amex in this court.[3] After answering each Complaint, Amex moved for judgment on the pleadings, arguing that all of the MPs' claims are barred by the Sherman Act's four-year statute of limitations. On March 3, 2010, the court denied the motion, holding that the MPs alleged facts that, if true, would allow both their Section 1 and 2 claims to proceed under exceptions to the Sherman Act's four-year statute of limitations. See generally SOL Decision, 708 F. Supp. 2d at 264-72; see also infra Part III.B.3 (addressing Amex's motion for summary judgment on its statute of limitations and laches defenses).

In October 2010, the Department of Justice and the attorneys general of eighteen states filed the Government Action against Amex, MasterCard, and Visa. In 2011, several new MPs filed antitrust actions against Amex, asserting claims similar to those alleged by the original MPs.[4] The MP Actions (including those actions filed in 2008 and those filed in 2011) and the Government Action against Amex[5] proceeded to coordinated discovery.

In late 2013, Amex moved for summary judgment in both the Government Action and the MP Actions, and moved to consolidate the actions for trial. (See Not. of Mot. for Summ. J.

---

[3] See Rite Aid Corp., et al. v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2315 (NGG) (RER) (E.D.N.Y.); CVS Pharmacy, Inc. v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2316 (NGG) (RER) (E.D.N.Y.); Walgreen Co. v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2317 (NGG) (RER) (E.D.N.Y.); BI-LO, LLC v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2380 (NGG) (RER) (E.D.N.Y.); H.E. Butt Grocery Co. v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2406 (NGG) (RER) (E.D.N.Y.).

[4] See The Kroger Co., et al. v. American Express Travel Related Services Co., Inc., et al., No. 11-CV-337 (NGG) (RER) (E.D.N.Y.); Meijer, Inc., et al. v. American Express Travel Related Services Co., Inc., et al., No. 11-CV-338 (NGG) (RER) (E.D.N.Y.).

[5] Visa and MasterCard entered into consent decrees with the Government on the same day that the Government Action was initiated. Only Amex remained as a defendant.

3

(Dkt. 276)[6]; Not. of Mot. to Consolidate for the Purpose of Trial (Dkt. 279); Not. of Mot. for Summ. J. (Dkt. 281 in Gov't Action).) In the MP Actions, Amex argued that: (1) the MPs' alleged Amex-only market fails as a matter of law; (2) the MPs' claims related to Amex's NDP prohibiting differential surcharging (the "no-surcharge rule") should be dismissed; and (3) the evidentiary record reflects that no exceptions to the four-year statute of limitations apply, and the claims of all MPs except Albertson's LLC ("Albertsons") are therefore time-barred.[7] (See Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Original Mem.") (Dkt. 277-1) (filed under seal); Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. ("Defs.' Original Reply") (Dkt. 308-1) (filed under seal).) The MPs opposed Amex's motion, but they did not cross-move for summary judgment at that time. (MPs' Opp'n to Defs.' Mot. for Summ. J. ("MPs' Original Mem.") (Dkt. 287-1) (filed under seal); MPs' Sur-Reply in Opp'n to Defs.' Mot. for Summ. J. (Dkt. 324).) In connection with Amex's motion, the parties filed voluminous factual materials and 56.1 statements, which the court has reviewed.

On March 19, 2014, the court held oral argument on Amex's motions for summary judgment in the Government Action and the MP Actions. (See Mar. 20, 2014, Min. Entry.) The court denied Amex's motion for summary judgment in the Government Action in May 2014. (See May 7, 2014, Mem. & Order (Dkt. 369 in Gov't Action).) Separately, the court denied Amex's motion to consolidate the actions for the purpose of trial (see generally Feb. 11, 2014, Order (Dkt. 335)), and stayed the MP Actions during the pendency of a motion for final settlement approval in consolidated class actions that comprise part of the MDL and in which the

---

[6] Unless otherwise noted, citations to docket numbers refer to entries made in In re American Express Anti-Steering Rules Antitrust Litigation, No. 11-MD-2221 (NGG) (RER) (E.D.N.Y.).
[7] The parties agree that Albertsons has timely asserted its antitrust claims.

MPs are putative class members[8] (see Class Settlement Preliminary Approval Order (Dkt. 333)). At that time, the court reserved judgment on Amex's motion for summary judgment in the MP Actions.

The Government Action proceeded to trial before the court during the summer of 2014. On February 19, 2015, the court issued the Government Decision, see 88 F. Supp. 3d at 143, finding by a preponderance of the evidence that the specific NDPs challenged by the Government[9] violate Section 1.[10] After receiving additional briefing from the parties to the Government Action, as well as other interested parties including the MPs, the court issued a Permanent Injunction on April 30, 2015 (see Order Entering Permanent Injunction as to the American Express Defs. (Dkt. 638 in Gov't Action)), as well as a Memorandum setting forth its reasoning concerning the scope of the Permanent Injunction, see Am. Express Co., 2015 WL 1966362.

Amex subsequently moved to stay the implementation of the Permanent Injunction pending its appeal of the Government Decision; the court denied the motion on May 19, 2015, holding, among other things, that Amex could not show that there was a substantial possibility that it would prevail on the merits of its appeal. (See May 19, 2015, Order (Dkt. 663 in Gov't Action).) Amex thereafter filed a notice of appeal (Not. of Appeal (Dkt. 664 in Gov't Action)), and sought a stay pending appeal from the Second Circuit. On June 16, 2015, a three-judge

---

[8] On August 4, 2015, the court ultimately denied the joint motion of class plaintiffs and Amex for final approval of their proposed class action settlement. See In re Am. Express Anti-Steering Rules Antitrust Litig., No. 11-MD-2221 (NGG) (RER), 2015 WL 4645240 (E.D.N.Y. Aug. 4, 2015). Various class actions related to Amex's NDPs, as well as a related class action captioned Marcus Corp. v. American Express Co., No. 13-CV-7355 (E.D.N.Y.) (NGG) (RER), remain pending before the court.

[9] The MPs challenge the same NDPs at issue in the Government Action, as well as two additional provisions contained in the NDPs that the Government did not challenge: (1) the no-surcharge rule, a provision prohibiting merchants from imposing a fee for the use of an Amex card that is not imposed equally on all other payment products (i.e., prohibiting merchants from differentially surcharging Amex cards vis-à-vis its competitors' cards), and (2) a provision prohibiting merchants from mischaracterizing Amex cards or engaging in activities that harm Amex's business or brand. See Government Decision, 88 F. Supp. 3d at 163.

[10] The Government Action included only a Section 1 claim, and did not include a Section 2 claim.

5

panel of the Second Circuit denied the motion. (See June 16, 2015, Order of U.S. Court of Appeals (Dkt. 687 in Gov't Action).)

During a status conference on July 7, 2015, the court lifted the stay of the MP Actions and set a trial date; the court also granted the MPs leave to file a motion to amend the operative pleadings and a cross-motion for summary judgment on the basis of collateral estoppel. (See July 7, 2015, Min. Entry.) Accordingly, the following motions are now pending before the court: (1) Amex's motion for summary judgment (filed in the fall of 2013 and discussed above); (2) the MPs' motion for leave to amend the operative pleadings (see MPs' Mot. to Suppl. or Amend Compls. (Dkt. 667)); (3) the MPs' motion for collateral estoppel (see MPs' Mot. for Collateral Estoppel (Dkt. 663)); and (4) the MPs' motions for partial summary judgment on liability under Sections 1 and 2 (see Albertson's LLC's Mot. for Partial Summ. J. on Liability under § 1 (Dkt. 664); MPs' Mot. for Partial Summ. J. under § 1 (Dkt. 665); MPs' Mot. for Partial Summ. J. on Liability under § 2 (Dkt. 666)).[11] With respect to the MPs' motions, the parties have filed consolidated briefs discussing the impact of the Government Action as well as the factual record developed in the MP Actions. (See MPs' Omnibus Mem. ("MPs' Suppl. Mem.") (Dkt. 668-1) (filed under seal); Defs.' Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. and in Opp'n to MPs' Mots. ("Defs.' Suppl. Mem.") (Dkt. 687-1) (filed under seal); MPs' Reply Br. in Supp. of Mots. (Dkt. 694-1) (filed under seal).) On November 12, 2015, the court heard oral argument on the pending motions in the MP Actions. (See Nov. 13, 2015, Min. Entry.)

On December 17, 2015, a panel of the Second Circuit held oral argument on Amex's appeal of the Government Decision. On December 18, 2015, the panel entered on its own motion a temporary stay of the Permanent Injunction and a temporary stay of the Government

---

[11] Also pending before the court are four fully briefed motions in limine, which the court does not address in this Memorandum and Order.

Action in this court. (See Dec. 18, 2015, Order of U.S. Court of Appeals (Dkt. 697 in Gov't Action).) As of the entry of this Memorandum and Order, the Second Circuit has not issued a decision in the appeal of the Government Action.[12]

## II.    MPs' MOTIONS BASED ON GOVERNMENT DECISION

The court first addresses the MPs' motions for leave to amend the pleadings and for the application of collateral estoppel in each of the MP Actions. For the reasons discussed below, the motions are DENIED WITHOUT PREJUDICE.

### A.    Legal Standards

#### 1.    Leave to Amend

Although Federal Rule of Civil Procedure 15 provides that a court "should freely grant leave when justice so requires," Fed. R. Civ. P. 15(a)(2), Rule 16 further provides that a pre-trial scheduling order "may be modified only for good cause and with the judge's consent," Fed. R. Civ. P. 16(b)(4). See also Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000) (discussing the interaction between Rule 15 and Rule 16 and "holding that despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause"). In Parker, the Second Circuit explained that good cause depends in part on the diligence of the moving party. 204 F.3d at 340. In addition, the court may, in its discretion, "consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007).

---

[12] The court does not construe the panel's December 18, 2015, Order as having any jurisdictional effect on the MP Actions, which were separately filed from the Government Action and are not currently before the Second Circuit.

In addition, even where the movant shows good cause under Rule 16, it must also show that the amendment would comply with Rule 15—in other words, that amendment is not futile, is not the product of undue delay or bad faith, and would not overly prejudice the non-movant.[13] See, e.g., Joinnides v. Floral Park-Bellerose Union Sch. Dist., No. 12-CV-5682 (JS) (AKT), 2015 WL 1476422, at *15 (E.D.N.Y. Mar. 31, 2015) ("If the party seeking the amendment satisfies the 'good cause' standard of Rule 16(b), the court then determines whether the movant also meets the liberal standards of Rule 15(a)." (citing Kassner, 496 F.3d at 244)).

### 2. Collateral Estoppel

The doctrine of non-mutual offensive collateral estoppel allows a plaintiff who was not a party to a prior judgment to "use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in the earlier proceeding." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979); see also Montana v. United States, 440 U.S. 147, 153 (1979) ("Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."). Issue preclusion may only apply where: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." In re PCH Assocs., 949 F.2d 585, 593 (2d Cir. 1991).[14] The specific

---

[13] In the context of an amendment to a pleading, certain of the typical Rule 15 inquiries merge, in effect, with the Rule 16 inquiry, such as prejudice to the non-movant. Others, however, do not, including whether the amendment is futile even if the movant shows good cause to modify the scheduling order.

[14] The MPs argue that the Supreme Court's recent decision in B&B Hardware, Inc. v. Hargis Industries Inc., 135 S. Ct. 1293 (2015), broadened the identicality standard into an inquiry concerning whether the two issues in the two actions are not "materially unlike." (See, e.g., MPs' Suppl. Mem. at 22 ("The question is whether steering by discounting is 'materially unlike' steering by surcharging in a manner that has 'legal significance' . . . .").)

legal claims asserted in the second action need not be identical to those asserted in the prior action for collateral estoppel to apply. See Parklane Hosiery, 439 U.S. at 326 n.5 ("Under the doctrine of collateral estoppel . . . , the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action."). With respect to the fourth element, "[a]n issue is necessary to a prior judgment for issue preclusion purposes if its disposition was the basis for the holding with respect to the issue and not mere dictum." MTS, Inc. v. 200 E. 87th St. Assocs., 899 F. Supp. 1180, 1184 (S.D.N.Y. 1995) (internal quotation marks and citations omitted); see also RX Data Corp. v. Dep't of Soc. Servs., 684 F.2d 192, 197 (2d Cir. 1982) (explaining that collateral estoppel applies if the prior determination was "necessary and essential to the judgment in that action"); Restatement (Second) of Judgements § 27 cmt. j ("The appropriate question, then, is whether the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment.").

In the Second Circuit, "each of two alternative, independent grounds for a prior holding is given effect for collateral estoppel purposes."[15] Purdy v. Zeldes, 337 F.3d 253, 258 n.6 (2d Cir. 2003); see also Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 45 (2d Cir. 1986); Irving

---

The court is not convinced that the Supreme Court's decision in B&B Hardware went so far. There, in holding that findings from a registration challenge to a trademark in the Trademark Trial and Appeal Board ("TTAB") could apply to a later infringement action brought in federal court, the Court noted that if the same usage of a trademark is at issue in the registration proceeding and the district court proceeding, then the "issues" to be decided in the context of the likelihood of confusion test are likely identical, but that if "a mark owner [later] uses its mark in ways that are materially unlike the usages in its [previous TTAB] application, then the TTAB is not deciding the same issue" as presented in the later federal action based on the later use of the mark. B&B Hardware, 135 S. Ct. at 1308. Nothing in the Court's analysis indicates that its use of the "materially unlike" framework applies outside of the factual context of the case—i.e., whether determinations made about a usage of a mark in the first action apply to a similar analysis of a materially similar usage of a mark in the second action. Cf. id. ("A fortiori, if the TTAB considers a different mark altogether, issue preclusion would not apply.").

[15] This differs from the approach of other circuits, see, e.g., Turney v. O'Toole, 898 F.2d 1470, 1472 n.1 (10th Cir. 1990) ("Because either proposed reason would have been a sufficient ground for granting the writ, it cannot be said that either issue was actually and necessarily decided."), as well as the Restatement of Judgments, see Restatement (Second) of Judgements § 27 cmt. i ("If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone.").

Nat'l Bank v. Law, 10 F.2d 721, 724 (2d Cir. 1926) (Hand, J.). "However, if an appeal is taken and the appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to the unreviewed ground." Gelb, 798 F.2d at 45. In addition, in the Second Circuit, a lower court judgment is "final" for purposes of collateral estoppel even while an appeal of that judgment is pending. See United States v. Int'l Bhd. of Teamsters, 905 F.2d 610, 620-61 (2d Cir. 1990).

A trial court has broad discretion in determining whether collateral estoppel should apply, and it should not apply the doctrine where doing so would be unfair to a defendant. Parklane Hosiery, 439 U.S. at 331; see also, e.g., PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004) ("[C]ollateral estoppel is an equitable doctrine—not a matter of absolute right. Its invocation is influenced by considerations of fairness in the individual case."); Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1486 (2d Cir. 1995) ("Despite the economies achieved by use of collateral estoppel, it is not to be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results."). For example, application of collateral estoppel may be unfair where the defendant did not have incentive to litigate the issue(s) in the first action vigorously or could not foresee follow-on actions, where the resolution of the first action is inconsistent with other previous decisions, or where procedural opportunities available to the defendant in the second action were unavailable in the first action and may have led to a different result. Parklane Hosiery, 439 U.S. at 331-32.

Finally, where collateral estoppel does apply, a plaintiff may use its application as a basis for seeking summary judgment in full or in part. See, e.g., id. at 324 (affirming grant of partial summary judgment through application of non-mutual offensive collateral estoppel); Discover Fin. Servs. v. Visa U.S.A. Inc., 598 F. Supp. 2d 394, 397 (S.D.N.Y. 2008) (granting in part and

denying in part the plaintiff's motion for partial summary judgment on the basis of collateral estoppel).

**B.    Discussion**

The MPs only seek leave to amend their alleged market definition to conform to the Government Action in the event that the court finds it appropriate to give preclusive effect to that issue. Accordingly, the court first turns to the MPs' motion for collateral estoppel.

The parties offer widely diverging views on the appropriateness of applying collateral estoppel in this action. Under the MPs' approach, collateral estoppel would allow the court to enter summary judgment in their favor on their claims under both Sections 1 and 2, including claims related to the no-surcharge rule, leaving as the only triable issues of fact Amex's statute of limitations defense and damages. According to Defendants, the MPs' attempt to apply broadly the findings from the Government Action to the MP Actions is improper, and, given the number of issues that cannot be resolved by the application of collateral estoppel, there would be no efficiency gained by a more limited application.

The court first notes that the application of collateral estoppel is not uncommon in the context of private antitrust actions that follow a successful government enforcement action. See, e.g., Univac Dental Co. v. Dentsply Int'l, Inc., 702 F. Supp. 2d 465, 491 (M.D. Pa. 2010) (adopting report and recommendation) ("These principles apply with particular force to a case such as this, where many of the questions raised in this private antitrust action arise out of the precise business practices which have been thoroughly, comprehensively and fairly litigated in the prior case brought by the United States. In such instances, the use of the offensive issue preclusion doctrine to resolve fully litigated issues as a matter of law has been expressly endorsed by the courts." (citations omitted)); Discover, 598 F. Supp. 2d at 397-401 (applying

11

collateral estoppel to certain core antitrust issues following the Second Circuit's affirmance of the Government's action against Visa and MasterCard).

However, considering the current posture of the Government Decision and the court's discretion in determining whether to apply collateral estoppel, the court defers a resolution of the MPs' motion for collateral estoppel until after the Second Circuit reaches a decision in the appeal of the Government Action. The MPs have not identified any case, nor is the court aware of any case, in which a district court gave preclusive effect to such a significant set of antitrust issues during the pendency of a merits appeal of the first-decided action. To apply collateral estoppel under such circumstances—even assuming each of the four elements were met as to each issue—would be unfair to Defendants. In addition, depending on the Second Circuit's resolution of the appeal of the Government Action, the application of collateral estoppel at this stage in the proceeding could, in fact, create inefficiencies. Accordingly, the court DENIES WITHOUT PREJUDICE the MPs' motion for collateral estoppel, with leave to renew the application following the Second Circuit's decision in the Government Action.

Because the court denies the MPs' motion for collateral estoppel, it need not determine whether there is good cause to amend the Scheduling Order under Rule 16, or whether leave to amend should be granted under Rule 15. Accordingly, the court DENIES WITHOUT PREJUDICE the MPs' motions for leave to amend the Scheduling Order and to amend the operative pleadings' alleged product market, with leave to renew the motions following the Second Circuit's decision in the Government Action.

## III.     CROSS-MOTIONS FOR SUMMARY JUDGMENT

The MPs move for summary judgment on the basis of collateral estoppel and, for certain issues, collateral estoppel combined with record evidence. Because the court declines to apply

collateral estoppel at this stage of the proceeding, see supra Part II.B, the MPs' motion for summary judgment is DENIED WITHOUT PREJUDICE, with leave to renew their application following the Second Circuit's decision in the Government Action and in advance of trial.

Amex moves for summary judgment on three distinct issues: (1) the alleged Amex-only market, (2) the MPs' claims related to the no-surcharge rule, and (3) Amex's statute of limitations and laches defenses as to all MPs except Albertsons. For the reasons discussed below, the court (1) RESERVES JUDGMENT on Amex's motion for summary judgment on the Amex-only market until after the Second Circuit's resolution of the appeal of the Government Action, (2) DENIES summary judgment as to the no-surcharge rule, and (3) DENIES summary judgment as to Amex's statute of limitations and laches defenses.

### A.    Legal Standards

#### 1.    Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); see also Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

13

The moving party bears the initial burden to show an absence of genuine factual dispute. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and may not rely on "conclusory allegations," Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990).

   2.  Statute of Limitations and Laches

  In the SOL Decision, the court set forth the standards governing the statute of limitations and the relevant exceptions, see 708 F. Supp. 2d at 257, which the court again outlines below.

    *a.*  *Section 2 Claim*

  With respect to the MPs' Section 2 claim, the court explained that "[t]he date on which a section two monopolization claim accrues depends on the relationship that the plaintiff has with the defendant as either a competitor or as a purchaser of the defendant's products and services." SOL Decision, 708 F. Supp. 2d at 264 (citing Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 295-96 (2d Cir. 1979)). "A purchaser plaintiff's cause of action [such as the MPs'] accrues when he or she actually pays an overcharge." Id. Accordingly, the court held, "[u]nder Berkey's purchaser rule, Plaintiffs' section two overcharge claims accrued when they paid Amex a supracompetitive merchant discount fee. The statute of limitations in this context only bars Plaintiffs' claims based on overcharges outside of the limitations period—i.e. overcharges paid more than four years before filing suit." Id. at 265.

### b. Section 1 Claim

With respect to the MPs' Section 1 claim, the court first explained that "[u]nder Zenith's general accrual rule, any section one cause of action arising out Amex's merchant agreements accrued on the date that Plaintiffs' merchant agreements took effect." Id. at 265 (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971)). Because all MPs other than Albertsons filed suit more than four years after their respective merchant agreements took effect, the court considered whether the speculative damages exception and/or the continuing violation exception could apply to the MPs' Section 1 claim as alleged. Id. at 266-72.

First, the court concluded that the MPs adequately alleged that at the time they signed their merchant acceptance agreements with Amex, damages caused by Amex's alleged overcharges were speculative, since they could not have been reasonably estimated. Id. at 266. In other words, the speculative damages exception, first announced in Zenith, 401 U.S. at 339, "applies in this circuit if the fact of damage is uncertain or if the nature and amount of damages cannot be reasonably estimated." Id. The court explained that at the time each MP signed its merchant agreement, "the amount of Plaintiffs' damages arising from Amex's supracompetitive discount fees could not have been reasonably estimated," since "[t]he merchant agreements did not specify the payment schedule or the quantity of Plaintiffs' purchases of Amex payment services: when, how large, and how many Amex retail transactions Plaintiffs would process." Id. at 266-67. Moreover, the court explained, "[e]ven if these terms could have been estimated when Plaintiffs executed the merchant agreements, Amex retained the ability to unilaterally change the discount fee after the agreements' initial terms." Id. at 267.

15

Here, the court noted that Amex could present evidence following discovery showing that future damages could have been reasonably estimated, and addressed the potential interplay between the speculative damages exception and the purchaser-accrual rule under Section 2:

> Following discovery, Amex may introduce evidence showing that future damages flowing from Plaintiffs' merchant agreements could have been reasonably estimated when they became effective. If future damages were not speculative when the agreements became effective, the cause of action to collect them would also have accrued at that time. If damages were not speculative, Plaintiffs' section two claims may also be time-barred. As discussed above, Berkey's purchaser accrual rule is based on the rationale that a purchaser's damages for paying overcharges are "entirely speculative" until the purchaser actually pays the overcharge. If damages from Amex's overcharges could have been reasonably estimated based on the terms contained in the merchant agreements, the justification for the purchaser accrual rule may not apply.

Id. at 267.

Next, the court concluded that the MPs also adequately alleged that the continuing violation exception applied. Id. at 267-72. The court explained that "[i]n cases challenging illegal contracts made effective before the limitations period and that remain effective during the limitations period, the continuing-violation question is whether acts within the limitations period toll the cause of action challenging the underlying contract." Id. at 268. Again noting the alleged speculative nature of the MPs' damages, the court surveyed the relevant case law and held that contractual performance can qualify as an "overt act" for purposes of restarting the four-year statute of limitations where damages are otherwise speculative; here, as alleged, Amex's mere collection of discount fee payments could not qualify as an overt act as a matter of law, since such an act is not new and independent, but Amex's alleged unilateral increases to its merchant discount fee during the contractual period could qualify as an overt act, and therefore restart the statute of limitations. Id. at 268-72. Thus, the court held, "[u]nder the continuing

16

violation exception, Plaintiffs' section one claims are not barred to the extent that they seek damages based on fee adjustments that Amex implemented within four years before Plaintiffs filed suit." Id. at 272.

c. *Claims for Equitable Relief*

Finally, with respect to the MPs' claims for equitable relief, the court explained that the Clayton Act's four-year statute of limitations does not apply to claims for equitable relief, but that a four-year period of laches does apply to such claims. Id. at 272. "After the four-year laches period expires, a court may, in its discretion, allow an action for equitable relief to go forward if it determines '(1) that sufficient reasons cognizable in equity excuse the delay or (2) that the delay caused defendants no prejudice.'" Id. (quoting Argus Inc. v. Eastman Kodak Co., 552 F. Supp. 589, 599 (S.D.N.Y. 1982)). Because the parties had not specifically addressed the applicability of the laches defense in their briefing, the court declined to reach the issue in the SOL Decision. See id.

**B.** **Discussion**

1. <u>Amex-only Market</u>

Amex continues to press its argument that a reasonable jury could not find that there is an Amex-only product market, and argues that the findings made against Amex in the Government Decision only reinforce this argument. Considering the analytical significance of the alleged product market to the MPs' claims, and that the MPs may ultimately renew their motions for leave to amend the pleadings and for the application of collateral estoppel following the Second Circuit's decision, the court RESERVES JUDGMENT on this ground.

2.    No-surcharge Rule

Defendants argue that a reasonable jury could not find that the no-surcharge rule is an antitrust violation. The court disagrees. There is ample evidence in the record in the MP Actions from which a reasonable jury could find that for purposes of Section 1, the no-surcharge rule has an adverse effect on competition and that the procompetitive justifications of the no-surcharge rule do not outweigh any anticompetitive effects, or that for purposes of Section 2, the no-surcharge rule is a form of maintaining monopoly power, and that there is not a valid business reason for it.[16] The court again notes that the Government Action did not include a challenge to the no-surcharge rule; however, should the Second Circuit's decision in the Government Action affect the analysis of the no-surcharge rule, Defendants may seek leave to renew their motion for summary judgment on this ground in advance of trial, or move for judgment as a matter of law during or after trial.

First, contrary to Defendants' arguments, the cases they cite do not establish that, as a matter of law, the no-surcharge rule is not an unreasonable restraint and/or is pro-competitive. (See Defs.' Original Mem. at 21-24; Defs.' Original Reply at 22-23; Defs.' Suppl. Mem. at 26-28 (all discussing Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86, 90 (6th Cir. 1989) and Kartell v. Blue Shield of Massachusetts, 749 F.2d 922 (1st Cir. 1984) (Breyer J.)).)

In Tennessean Truckstop, the Sixth Circuit held that a merchant challenging a network services provider's contractual provision prohibiting it from imposing a surcharge over 5% of the price of the good failed to allege antitrust injury. 875 F.2d at 87-88. According to the Sixth

---

[16] Because the court finds that summary judgment is inappropriate even if the no-surcharge rule is analyzed unbundled from the rest of the NDPs, it need not reach the MPs' argument that consideration of the no-surcharge rule in isolation is legally impermissible. (See MPs' Original Mem. at 38-40 (arguing that principles set forth in Continental v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962), preclude consideration of one alleged restraint without consideration of the others); Defs.' Original Reply at 23-24 (arguing that consideration of the no-surcharge rule in isolation is appropriate because regulators and Congress have elected to treat discounting and surcharging differently).)

Circuit, the merchant's complaint failed to allege an injury to competition and merely alleged that it lost profits due to the network services provider's conduct. Id. at 88. Here, however, the MPs allege (and have offered evidence tending to show) that the no-surcharge rule prevents Amex-accepting merchants from imposing a surcharge on any credit card transaction, thereby eliminating any incentive for network services providers to compete horizontally on price. Tennessean Truckstop is therefore distinguishable on at least this ground.

In Kartell, doctors challenged a health insurer's program in which the insurer agreed to pay participating doctors a pre-set, capped price as payment in full for medical services rendered to insureds, but under which the doctors could not raise the price or surcharge insureds above the price the insurer agreed to pay. 749 F.2d at 923-24. Writing for the panel, and noting the uniqueness of the health insurance industry, then-Judge Breyer explained that the program was not an unlawful restraint in violation of Section 1, since the insurer "in essence 'buys' medical services for the account of others," and merely "obtained prices [on behalf of the insureds] that reflected its market power." Id. at 925, 928. In other words, the conduct at issue was simply an agreement between a buyer (the insurer) and a seller (the doctors) regarding price—"[w]hether or not that price bargain is, in fact, reasonable is, legally speaking, beside the point." Id. at 928. Indeed, the court noted that "the prices at issue here are low prices, not high prices," and "the Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too high, not too low." Id. at 930-31 (emphasis in original).

Here, however, the MPs have offered evidence tending to show that they, the purchasers of Amex's services, are paying higher prices as a result of the NDPs' inhibition on horizontal price competition, including through the no-surcharge rule. In addition, the MPs have also offered evidence tending to show that because merchants pass the costs of network services

19

through to consumers, those consumers who pay with forms of payment other than Amex cards pay a higher price for those goods, "effectively subsidiz[ing] the purchases made by customers who use higher-cost Amex cards." (MPs' Original Mem. at 42.) And again, like Tennessean Truckstop, Kartell lacked any allegation by the plaintiff that the insurance program eliminated horizontal competition across the entire product market.

The facts of Kartell also differ from this case in an important way. As another district court has observed, the holding in Kartell flowed in large part from "the First Circuit's reliance on the concept that [the insurer] was acting as a purchaser when it purchased, on behalf of its enrollees, services from doctors at the lowest possible prices." United States v. Delta Dental of R.I., 943 F. Supp. 2d 172, 177 (D.R.I. 1996) (adopting report and recommendation); cf. Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp., 472 F. Supp. 2d 385, 401 (E.D.N.Y. 2007) ("In short, a chorus of judicial opinion has proclaimed that when insurers purchase health services and pharmaceuticals for the benefit of their members, they are treated like purchasers under the antitrust laws." (emphasis in original) (footnote omitted)). But Amex does not purchase goods and services from merchants on behalf of its cardholders; rather, it provides card-payment services to cardholders and card-acceptance services to merchants as a way of facilitating a transaction between cardholder and merchant, and in doing so, collects a fee from the merchant. The MPs allege that in this capacity, and through the NDPs, Amex prohibits the merchant from expressing any preference (through a surcharge or otherwise) for any other "facilitator" (such as Visa or MasterCard) that may charge the merchant a lesser fee to facilitate the very same transaction between merchant and cardholder. Cf. Kartell, 749 F.2d at 925-26 (limiting its analysis to "contracts in which those who directly provide goods or services to insureds have agreed to cap or forego completely additional charges to those insureds in return

for direct payment by the insurer"). Amex does not "cap" the prices that merchants charge to its cardholders for goods or services—in other words, nothing in the NDPs prohibits a merchant from raising the price of each of the goods it offers by $2 or 2% to account for rising costs of network services and then passing that cost through to Amex cardholders.[17]

Second, Defendants present a public policy argument, focusing primarily on the fact that some states, including New York, have enacted statutes prohibiting merchant surcharging but no other forms of steering; indeed, New York's statute was recently upheld by the Second Circuit following a First Amendment challenge by merchants, see Expressions Hair Design v. Schneiderman, No. 13-4533-CV, ---F.3d ---, 2015 WL 8537667, at *1 (2d Cir. Dec. 11, 2015) (am. opinion).[18] However, while this public policy argument may be relevant, it cannot establish whether, for antitrust purposes, a parallel contractual restraint imposed by a market participant with market or monopoly power survives Sherman Act scrutiny. Even Defendants acknowledge that their public policy arguments cannot "immunize" their conduct, but rather, only serve to "reinforce the holdings of the relevant appellate case law," which the court has distinguished above. (See Defs.' Original Reply at 24.)

### 3. Statute of Limitations and Laches Defenses

Finally, the court denies Defendants' motion for summary judgment with respect to each of their statute of limitations and laches defenses.

---

[17] Of course, Amex does not make the parallel argument that the NDPs' prohibition on merchant discounting (as opposed to surcharging) ensures lower prices for its cardholders. A discount offered by a merchant for the cardholder's use of an Amex card would, in fact, result in lower prices for Amex cardholders. But the NDPs prevent such conduct by merchants.

[18] But see, e.g., Dana's R.R. v. Attorney Gen., No. 14-14426, 807 F.3d 1235, 1239, 1247 n.9 (11th Cir. 2015) (distinguishing Expressions Hair Design and explaining that "[t]autologically speaking, surcharges and discounts are nothing more than two sides of the same coin; a surcharge is simply a 'negative' discount, and a discount is a 'negative' surcharge").

*a.*    *Section 2*

With respect to the Section 2 claim, the parties dispute the meaning and intent of the court's SOL Decision. According to the MPs, "Amex's limitations defense only defines the time period for which the MPs can seek damages on [their] Section 2 claims, and cannot preclude Amex's liability." (MPs' Suppl. Mem. at 35-36.) Amex counters that the court's SOL Decision left open the possibility that the timeliness of the Section 2 claim "could turn on the factual record concerning whether damages were speculative." (Defs.' Suppl. Mem. at 17.)

Although the court previously stated in its discussion of the MPs' Section 1 claim that a showing by Amex that the MPs' Section 1 damages were not speculative <u>may</u> also render the purchaser-accrual rule inapplicable to the MPs' Section 2 claims, the court remains unconvinced that, as a matter of law, a defendant who successfully challenges an antitrust plaintiff's assertion of the Section 1 speculative damages exception thereby defeats the plaintiff's assertion of the Section 2 purchaser-accrual doctrine. Although <u>Berkey</u>'s discussion of the Section 2 purchaser-accrual exception does invoke language from <u>Zenith</u> addressing speculative damages under Section 1, <u>see Berkey,</u> 603 F.2d at 295 ("Plainly, at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future."), <u>Berkey</u> also makes clear that "[s]o long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide," <u>id.</u>  <u>See also id.</u> at 296 ("The taint of an impure origin does not dissipate after four years if a monopolist continues to extract excessive prices because of it."). The core holding of <u>Berkey</u> applies here, and Defendants have cited nothing to the contrary: "[A] purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions

taken before the limitations period." Id. Accordingly, assuming the MPs can establish Section 2

liability, they may, at a minimum, recover all Section 2 damages caused within four years of the

filing of each MP Action, or within four years of the commencement of the tolling of their

Section 2 claims.[19]

        *b.    Section 1*

Turning to the MPs' Section 1 claim, the court concludes that there are genuine issues of

material fact that must be resolved by a jury as to both the speculative damages and continuing

violation exceptions.

With respect to the speculative damages exception, the MPs have adduced evidence from

which a reasonable jury could infer that as of 2002, the MPs' then-future damages were

speculative.[20] In particular, there exist factual disputes concerning the ability of the MPs to

---

[19] Even if Amex was correct that, as a legal matter, a sufficient showing by a defendant that Section 1 damages were not speculative could defeat the application of the purchaser-accrual exception under Section 2, summary judgment on the Section 2 claim would not be appropriate in this case because there are genuine issues of material fact with respect to whether the MPs' Section 1 damages were or were not speculative. See infra Part III.B.3.b.

[20] The parties appear to agree that a purported class action challenging the NDPs filed on April 18, 2006, tolled the statute of limitations pursuant to American Pipe Construction Co. v. Utah, 414 U.S. 538 (1974), through the present. (See Defs.' Original Mem. at 3 & n.2; MPs' Original Mem. at 24 n.11.) Accordingly, for purposes of the speculative damages exception and summary judgment, the relevant inquiry is whether a reasonable jury could find that the MPs' future damages were speculative as of the beginning of May 2002. If a reasonable jury would be compelled to find that damages were reasonably estimable as of May 2002, then, based on the effective dates of each merchant agreement, each MP's Section 1 claim (except Albertsons) would have necessarily expired before May 2006, no claims would be tolled pursuant to American Pipe, and the MP Actions (filed in 2008 and 2011) would be time-barred.

In other words, the parties appear to agree that damages that may have occurred in January 2002 are time-barred. Even if they were speculative as of the signing of the merchant agreement (for example, in 1996), these damages would have actually occurred (and were no longer speculative) at the very latest upon Amex actually imposing a supracompetitive discount fee for that particular month, and the MPs were therefore required to file suit for January 2002 damages by January 2006, before American Pipe tolling applied. The MPs did not file suit by January 2006, and claims related to January 2002 damages expired in January 2006. Claims related to damages that occurred in June 2002 would have similarly expired in June 2006, but American Pipe tolled the expiration of the claim for June 2002 damages through 2008 and 2011, when the MPs filed suit.

The court notes, in addition, that the filing of the Government Action in October 2010 also tolled any of the MPs' live claims as of that date. See 15 U.S.C. § 16(i). However, because the Government Action was filed many years after the May 2006, class action, it is the 2006 date and American Pipe tolling that provides the MPs with the longest period of tolling and the relevant date of May 2002 for purposes of the speculative damages exception.

estimate, as of 2002, critical elements of their alleged damages, such as future Amex charge

volume and the future discount fees or other charges that would be imposed by Amex for that

charge volume. In addition, it is undisputed that Defendants possessed the unilateral right to

raise the discount rate throughout the contractual period. Viewed in the light most favorable to

the MPs, these were no ordinary contracts; rather, they were long-term agreements under which

the MPs had no ability to estimate accurately the core variables of any damages projection,

including charge volume (dependent upon third-parties' use of the Amex card at the point-of-sale

and in turn dependent on Amex's success at card issuance) and overall discount rate (dependent

upon Amex's ability to change the base discount rate and effective discount rate throughout the

term of the contract). Cf., e.g., Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546

F.2d 570, 573 (4th Cir. 1976) (affirming grant of summary judgment where, before entering into

contract, plaintiff included in application to defendant its projections of total subscribers and

gross receipts, and later "introduced no proof that cast doubt on its projections or indicated that

they were speculative"); Tex. Utils. Co. v. Santa Fe Indus., Inc., 627 F. Supp. 44, 48-49

(D.N.M. 1985) (denying motion for summary judgment where plaintiffs offered evidence "that

the prices they had to pay for coal under the contracts were indeterminable at the time these

contracts were made" because, inter alia, ultimate payments under the contracts fluctuated due to

yearly changes in government-calculated "implicit price deflator," based on the gross national

product for each calendar year); In re N.M. Nat. Gas Antitrust Litig., MDL No. 403 (HCB), 1982

WL 1827, at *14 (D.N.M. Jan. 26, 1982) (denying motion for summary judgment on statute of

limitations defense and explaining that "[t]his is not a case where the [pre-limitations contract]

finalized the rights and liabilities of the parties by fixing the price, quantity, and delivery or

payment schedules so that any subsequent acts were but unabated inertial consequences of some pre-limitations action" (internal quotation marks and citations omitted)).

With respect to the continuing violation exception, genuine issues of material fact again preclude summary judgment. Defendants reference the court's statement in the SOL Decision that the MPs could ultimately prove an alleged continuing violation because "Amex's unilateral increases to its merchant discount fee do constitute overt acts." SOL Decision, 708 F. Supp. 2d at 271 (emphasis added). According to Amex, the evidentiary record now shows that "the merchant discount fees have been constant—or dropped—for each Plaintiff." (Defs.' Original Mem. at 19 (footnote omitted).) The MPs respond that Amex's "hyper-technical view" of the merchant discount rate focuses solely on the base discount rate, ignoring other unilateral changes imposed by Amex that affected the net price paid (the effective discount rate) by merchants to Amex for its services during the contractual period. (See MPs' Original Mem. at 31.)

The court recognizes that a narrow reading of the SOL Decision—which was based only on the court's understanding of the allegations in the original complaints in the MP Actions— could support Defendants' argument that summary judgment should be granted on the continuing violation exception due to the MPs' failure to rebut Defendants' evidence that they did not unilaterally raise base discount rates during the contractual period. However, the evidence offered by the MPs at this stage of the proceeding raises a genuine issue of material fact concerning whether Amex's other unilateral changes to the effective discount rate (such as changes to significant rebate and incentive programs) were overt acts sufficient to restart the limitations period with respect to damages caused by those acts. Indeed, the MPs have offered

evidence tending to show that Amex officials viewed these changes as relevant to the effective rate paid by merchants to Amex for its services.[21]

Defendants are correct, however, that if the MPs rely solely on the continuing violation exception at trial, they can only recover damages caused by Amex's overt acts. See Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."); see also Zenith, 401 U.S. at 338 ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . , as to those damages, the statute of limitations runs from the commission of the act."); Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1104 (2d Cir. 1988) ("An action for the injury must be brought within four years, plus any additional period during which the statute of limitations may be tolled. In the context of a continuing antitrust violation with continuing injuries, this has usually been understood to mean that each time plaintiff suffers an injury

---

[21] With respect to a minority of the MPs, the parties dispute whether agreements entered from 2002 through 2005, which appear to have amended each of the particular MPs' operative card acceptance agreements in order to create new, higher fuel discount rates as opposed to the pre-existing and otherwise generally applicable supermarket discount rates, constitute overt acts that inflicted new injury under the continuing violation doctrine. Amex argues that the increased fuel discount rates merely remedied a windfall that the MPs were receiving for fuel that they sold, since fuel discount rates for other fuel retailers were historically higher than supermarket discount rates. (See Defs.' Original Reply at 20-21.) In addition, Amex argues that the agreements setting forth the fuel discount rates constitute agreed-upon contracts between it and the MPs, and therefore cannot qualify as a "unilateral" increase in the discount rate. (Id. at 20.) The MPs counter that the new fuel discount rates were exactly the type of act that qualifies as an overt act inflicting new injury under the continuing violation doctrine: whereas before, the MPs did not pay Amex a premium for fuel transactions, they did after the change.

The court concludes that genuine issues of material fact preclude the entry of summary judgment on this sub-issue. If the agreements containing the new fuel discount rates are, in fact, "new" and independent agreements between the MPs and Amex, then the court's discussion in the SOL Decision regarding when performance under a long-term contract can qualify as an overt act (e.g., a unilateral increase in the discount fee) becomes irrelevant, because a new claim for damages would have accrued at that time with respect to that particular contract and any resulting damages. If, on the other hand, the rise in fuel discount rates occurred pursuant to the original merchant agreements, the MPs have raised a genuine issue of material fact regarding whether the new rate is more than a mere "reaffirmation" of a previous act, and instead qualifies as an overt act that allows them to recover damages stemming from that act. Cf., e.g., Madison Square Garden, L.P. v. Nat'l Hockey League, No. 07-CV-8455 (LAP), 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008) (holding that the renewal of policy that does not include any substantive changes in the plaintiff's rights constitutes a reaffirmation of the prior act and not a new and independent act).

caused by an illegal act of defendants, a cause of action accrues to plaintiff to recover <u>damages</u> <u>based on that injury</u>." (emphasis added) (internal citations omitted)).

<em>c.    Claims for Equitable Relief</em>

Finally, Amex argues that the laches defense warrants summary judgment in its favor on the MPs' claims for injunctive relief. (<u>See</u> Defs.' Original Mem. at 18; Defs.' Original Reply at 21.) The MPs respond by arguing that (1) exceptions to the statute of limitations, including both the speculative damages and continuing violation exceptions, also serve as exceptions to the laches defense, and (2) even if the exceptions do not apply, Amex has failed to show the prejudice required for the laches doctrine to apply. (<u>See</u> MPs' Original Mem. at 33-35.)

As the court explained in the SOL Decision, the Clayton Act's four-year statute of limitations only applies to a damages action, whereas the defense of laches applies to actions in equity. <u>See</u> SOL Decision, 708 F. Supp. 2d at 272. Many courts use the applicable statute of limitations as a starting point to analyzing a parallel laches defense. <u>See, e.g.</u>, <u>Conopco, Inc. v.</u> <u>Campbell Soup Co.</u>, 95 F.3d 187, 191 (2d Cir. 1996) (explaining, in equity action under the Lanham Act, that "[a]lthough laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense"); <u>Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.</u>, 677 F.2d 1045, 1057 (5th Cir. 1982) ("[I]f the plaintiff's claim is brought outside the analogous limitations period, the bare fact of delay creates a rebuttable presumption of prejudice to the defendant." (internal quotation marks and citation omitted)); <u>Int'l Tel. & Tel. Corp. v. Gen. Tel.</u> <u>& Elecs. Corp.</u>, 518 F.2d 913, 926 (9th Cir. 1975) (using Clayton Act's four-year statute of limitations as "a guideline for computation of the laches period in suits" seeking equitable relief), <u>overruled on other grounds by</u> <u>California v. Am. Stores Co.</u>, 495 U.S. 271, 283 (1990).

"After the four-year laches period expires, a court may, in its discretion, allow an action for equitable relief to go forward if it determines (1) that sufficient reasons cognizable in equity excuse the delay or (2) that the delay caused defendants no prejudice." SOL Decision, 708 F. Supp. 2d at 272 (internal quotation marks and citation omitted); see also, e.g., Argus, 552 F. Supp. at 600 (denying motion for summary judgment where the defendants failed to establish the absence of genuine issue of material fact with respect to whether the plaintiffs' delay caused any prejudice).

Few decisions within the Second Circuit have analyzed the applicability of the laches defense in an antitrust action where an exception to the four-year statute of limitations for damages actions tolls the damages claims, and the court did not have occasion to do so in the SOL Decision. The MPs and Defendants each point to Madison Square Garden, L.P. v. National Hockey League, No. 07-CV-8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008). There, in finding the antitrust claim seeking an equitable remedy barred by laches, the court did consider the plaintiff's argument that the continuing violation exception should apply and toll the claim, but rejected the argument on the merits, as the plaintiff failed to allege an actionable overt act. See id. at *10; see also, e.g., Int'l Tel. & Tel., 518 F.2d at 928-29 (analyzing laches doctrine and considering both the court's equitable discretion and otherwise applicable exceptions to four-year statute of limitations, such as the continuing violation doctrine).

As laches is an equitable doctrine that the court applies in its discretion, there is limited analytical value to determining whether categorical "exceptions" to the four-year period of laches do or do not apply. But suffice it to say, here, the court already has held that there are genuine issues of material fact with respect to whether the speculative damages and continuing violation exceptions save the MPs' otherwise untimely damages claims. This determination is

28

sufficient, at this stage of the proceeding, to support a parallel determination that genuine issues of material fact preclude the entry of summary judgment on Amex's laches defense.[22]

Moreover, there are genuine issues of material fact with respect to whether there is any excuse for the MPs' delay in bringing suit or whether that delay caused any prejudice to Defendants. "A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim. Specifically, prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." Conopco, 95 F.3d at 192 (internal quotation marks and citations omitted) (discussing laches defense in context of Lanham Act). Here, the only equitable relief sought by the MPs is prospective in nature; they do not seek, for example, divestiture or to unwind a transaction, such as a merger. See 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320, at 374 (4th ed. 2014) ("A stricter limitation is especially appropriate and should be absolute where equity relief is retroactive in character, such as divestiture or illegally acquired assets. It is less true where the requested relief is merely prospective."); see also, e.g., Midwestern Mach. Co. v. Nw. Airlines, Inc., 392 F.3d 265, 277 (8th Cir. 2004) (finding that defendant would be prejudiced where plaintiff's equitable action was filed eleven years after allegedly anticompetitive merger, and shareholders who invested in company seven years after the merger had no reason to believe that the original merger could still be the basis for an antitrust suit). Where, as here, a plaintiff seeks only an injunction, "the right to engage in ongoing anticompetitive conduct should not ordinarily be acquired by prescription." Areeda & Hovenkamp, Antitrust Law ¶ 320, at 374.

---

[22] The court notes, as Amex points out, that there may be little reason to apply the speculative damages exception to the laches defense, as the reason justifying the exception—that the plaintiff could not have known the extent of its monetary damages at the time of the unlawful act—does not apply where the plaintiff could have brought suit seeking prospective injunctive relief to stop both the unlawful act and the further accumulation of unknown and speculative damages.

Defendants counter that they have "suffered obvious prejudice," as they "spent years operating, and investing in, a business model that relies on the NDPs that Plaintiffs now say are illegal." (Defs.' Original Mem. at 18.) But, since the initial signing of the merchant agreements, Amex has merely continued its longstanding practice of imposing NDPs on merchants, and has not, in fact, changed course or position in any significant way. The mere continuation of the very conduct challenged by the plaintiff is not the type of activity or investment by a defendant that the laches doctrine is designed to protect in equity. Cf. Conopco, 95 F.3d at 192-93 (focusing prejudice analysis on fact that during the plaintiff's delay in bringing suit targeting defendant's marketing strategy, defendant lost opportunity to adopt alternative marketing strategies that were adopted by rival brands in the interim).

Accordingly, the court denies Defendants' motion for summary judgment on the laches defense. At trial, the parties may offer any relevant evidence addressing the MPs' delay in bringing suit or any prejudice to American Express, but the court cannot enter summary judgment on this basis.

## IV.    CONCLUSION

For the reasons discussed above, the MPs' motion to modify the Scheduling Order and for leave to amend is DENIED WITHOUT PREJUDICE, the MPs' motion for the application of collateral estoppel is DENIED WITHOUT PREJUDICE, the MPs' motion for partial summary judgment is DENIED WITHOUT PREJUDICE. The court DENIES Amex's motion for summary judgment with respect to the no-surcharge rule and Amex's statute of limitations and laches defenses, and RESERVES JUDGMENT on Amex's motion for summary judgment with respect to the existence of an Amex-only market.

In addition, as noted above, the Government Action remains pending before the Second Circuit, and the merits panel has entered a stay of the Permanent Injunction entered in that case. Accordingly, the court postpones the May 2, 2016, trial date in the MP Actions, and stays all upcoming deadlines in the parties' pre-trial schedule. (See July 21, 2015, Order (Dkt. 642).) Within fourteen (14) days of the date of entry of the mandate following the Second Circuit's disposition of the appeal in the Government Action, the parties shall confer regarding potential trial dates and file a joint letter setting forth their availability.

     SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     January 7, 2016

NICHOLAS G. GARAUFIS
United States District Judge